# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CINDY CHRUMA, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 15-0132-WS-N |
| | ) | |
| RICHARD DARYL BOSARGE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment.  (Doc. 27).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 28, 30, 31, 35, 38),[1] and the motion is ripe for resolution.  After careful consideration, the Court concludes that the motion is due to be denied.[2]

## BACKGROUND

According to the complaint, (Doc. 1), the plaintiff's decedent ("Garrett") had an encounter with the defendant, an Alabama State Trooper then on duty.  As Garrett fled the defendant on foot, the defendant shot him three times in the back,

---

[1] The plaintiff's motion to supplement brief, (Doc. 38), which points out the existence of supplemental authority, is **granted** pursuant to Civil Local Rule 7(f)(3).  The defendant requested no opportunity to respond, as he could have.  *Id.*

[2] The defendant's motion to strike, (Doc. 34), is **denied**.  The defendant's disagreement with the evidence and argument presented in the plaintiff's brief furnishes no grounds to strike this material from the record.  *E.g., Collar v. Austin*, 2015 WL 5444347 at *2 (S.D. Ala. 2015) ("As the Court has often noted, the proper response to objectionable evidence is to discount such materials, not to strike them from the record.") (internal quotes omitted).  The Court has considered the plaintiff's evidence and argument and the defendant's objections thereto and given both the weight they deserve.

killing him.  Count One alleges that the defendant applied excessive force in violation of the Fourth Amendment.  Count Two asserts a wrongful death claim based on negligence, while Count Three asserts a wrongful death claim based on intentional assault and battery.  The defendant argues that he is protected by qualified immunity from the federal claim and by state-agent immunity from the state claims.  (Doc. 28 at 11, 28).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[3] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on

---

[3] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."). "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record …." *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotes omitted).

summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Plaintiff's Evidence.

At bottom, the defendant's motion presents a single, straightforward question: Viewing the evidence most favorably to the plaintiff, could a properly functioning jury find that the defendant shot Garrett while knowing that he was unarmed? The answer is equally straightforward: Yes.[4]

According to the plaintiff's evidence, on June 8, 2013, the defendant observed Garrett leave a convenience store driving a motorcycle without a helmet and decided to sign warrants for that offense (a misdemeanor), along with reckless endangerment (also a misdemeanor). A short time later, while driving along Mason Ferry Road with Reserve Trooper Evans, the defendant noticed Garrett traveling towards them, still without a helmet. The defendant used his vehicle to block the road, and Garrett drove his motorcycle into an adjoining driveway, then into a ditch paralleling the road, where the motorcycle apparently got stuck.

The defendant ran up to the motorcycle, grabbed the keys and shoved the motorcycle over. Garrett began running east down the middle of the ditch and the defendant pursued, running behind Garrett and to his left at the ridge of the ditch. Evans joined the chase somewhat later, also behind Garrett but to his right. Garrett, while running, used his right hand to pull a gun from his waistband and display it behind him, either to his right or to his left, depending on the witness.

To this point, the parties are in reasonable agreement, but now they diverge. The defendant states that, immediately upon seeing the gun, he drew his own gun and within a split second shot Garrett, with Garrett still holding the gun, in order to protect himself and Evans. (Doc. 28 at 8-9; Doc. 28-1 at 5, 29). The plaintiff

---

[4] The defendant acknowledges it is an undisputed fact that he issued no warning before shooting Garrett. (Doc. 28 at 27).

states that Garrett dropped the gun, that the defendant saw Garrett drop the gun, and that the defendant then shot Garrett knowing he was unarmed.

The plaintiff's version relies heavily on physical evidence.  As determined by the Alabama Bureau of Investigation ("ABI"), Garrett's gun was found 67 feet east of the motorcycle, and Garrett's feet (the westernmost part of his body) were 21½ feet east of his gun.  The shell casings from the defendant's gun were found 8-11 feet east of the gun, and the motorcycle keys were found about 14½ feet west of the body (and thus east of the gun).

Because Garrett's body was found east of his gun, the plaintiff concludes he was shot after he dropped the gun.  The defendant says Garrett continued moving east after being shot, but the plaintiff points out that one of the shots perforated Garrett's fourth thoracic vertebra and the right atrium of his heart.  According to the medical examiner, this blow would have felled Garrett "pretty much immediately," and certainly after no more than two stumbling steps.  (Doc. 31-27 at 8).  Since the defendant testified he fired all three shots "simultaneously," (Doc. 31-1 at 8), (which the tight pattern of the entry wounds tends to corroborate), it does not matter which of the shots caused these injuries.  A reasonable inference is that Garrett fell essentially where he was shot.

The plaintiff also points out that Garrett's body was found, not in the ditch, but on the east side of a driveway crossing over the ditch.  (Doc. 31-11; Doc. 31-21).  The defendant testified that Garrett kept running after he was shot and then "jumped up" to the driveway before collapsing.  (Doc. 31-1 at 11-13).  The medical evidence is that, in addition to a bullet through his spinal column and heart, Garrett had bullets through his stomach, diaphragm and both lungs, (Doc. 31-26), and according to the medical examiner it would have been impossible for Garrett to do what the defendant claims he did with three bullets through him.

The plaintiff next focuses on the location of the shell casings, all of which were found east of the gun.  The plaintiff's expert extensively tested the defendant's weapon and found a consistent, almost exceptionless pattern of

casings being ejected to the rear of the firearm between 4:00 and 6:00, at an average distance of nine to ten feet.  (Doc. 31-23 at 6, 10-12, 15-16, 21-23).  When holding the weapon at a 45-degree angle (as the defendant says he did), the casings were again ejected to the rear, between 6:00 and 8:00.  (*Id*. at 7, 26).  They were not ejected forward, as the defendant testified occurred on the day in question.  Under the plaintiff's evidence, the defendant would have been positioned east of the casings (and thus even farther east of Garrett's gun) when he fired.

Next are the motorcycle keys, which were found east of the gun.  The defendant says he shot Garrett while still holding the keys and dropped them only later, but an ABI investigator believes the defendant would have dropped the keys before drawing his weapon, (Doc. 31-8 at 19), presumably so that he could grip the weapon with both hands.  This evidence also would place the defendant east of Garrett's gun when he fired.

Based on his investigation, the ABI investigator places the defendant at the edge of the driveway – well east of the gun – when the shots were fired. (Doc. 31-8 at 26-30; Doc. 31-21).  The only eyewitness to the moment of the shooting places the defendant in the same area.  (Doc. 31-4 at 7; Doc. 31-8 at 15-16; Doc. 31-20).  Based on the physical evidence and his testing, the plaintiff's expert places the defendant on the driveway when he fired.  (Doc. 31-23 at 5, 18-19).  And, given the medical testimony that Garrett could not have moved more than two stumbling steps after being shot, the defendant's testimony that he remained within six to ten feet of Garrett throughout the encounter, (Doc. 31-1 at 15, 17), itself places him well east of the gun when he fired.

This evidence unquestionably creates a jury issue as to whether Garrett had dropped the gun before the defendant shot him.  The plaintiff now turns to her evidence that the defendant knew before he fired that Garrett had dropped the gun.

First, the plaintiff notes the defendant's constant proximity to Garrett, between six and ten feet away.[5]  Second, the plaintiff notes that witnesses could see what was unfolding from much farther away,[6] from which she reasonably infers that there was no hindrance to the defendant's ability to see.  Third, the defendant insists that he kept his eyes focused on Garrett's hands the whole time, (Doc. 31-1 at 15, 22, 24), from which the plaintiff reasonably infers that the defendant thus would have seen Garrett's hand release the gun.

The foregoing evidence is sufficient to permit a properly functioning jury to find that the defendant knew when he fired that Garrett had already dropped his gun, but there is more.  The defendant insists he fired his weapon while Garrett still held his gun, from a position well west of where the gun was found, and he insists that the mortally wounded Garrett then dropped the gun and kept running, even jumping up on a driveway.  As the plaintiff notes, (Doc. 30 at 30), from the physical, expert and eyewitness evidence discussed above, a properly functioning jury could conclude that the defendant is not merely mistaken about where he was when he fired; about seeing Garrett holding a gun at the moment he shot him; and about how Garrett behaved after being shot, but that the defendant is testifying falsely about these matters.  Because a jury that believes a witness has testified falsely about any material point is entitled to disbelieve the witness as to other points,[7] the jury could then reject the defendant's protestation of ignorance on that ground.

The defendant's response to the plaintiff's presentation is little short of astounding.  The plaintiff, he says, offers nothing but "supposition and conjecture," a "smoke-screen over the sworn deposition testimony" of the

---

[5] The ABI investigator places the defendant as close to Garrett as four feet at the moment he fired.  (Doc. 31-8 at 29-30).

[6] The defendant agrees that the eyewitnesses, from their houses on either side of the road, could see what was happening.  (Doc. 28 at 4 n.2, 5 n.3).

[7] Eleventh Circuit Pattern Jury Instructions (Civil) 3.5.1 (2013).

defendant.  (Doc. 28 at 24; Doc. 35 at 1).  It is "outlandish" to suggest that Garrett voluntarily dropped his weapon before the defendant shot him, (*id*. at 2), an "incredible" story "fabricated from whole cloth … without a scintilla of evidence to support" it.  (*Id*. at 9).  Again:  "There has been <u>no</u> evidence of any sort that Mr. Chruma dropped his gun prior to being shot by Trooper Bosarge."  (*Id*. at 2 (emphasis in original)).

But what of the physical evidence that Garrett's feet lay over 21 feet east of his gun?  What of the physical evidence that the defendant's shell casings were 8-11 feet east of Garrett's gun?  What of the expert's test results showing that the defendant had to be east of the casings and thus even further east of Garrett's gun?  What of the medical examiner's testimony that Garrett could not have continued running after being shot as he was?  According to the defendant, these are merely "anecdotal facts which have nothing to do with the factual analysis before" the Court.  (Doc. 35 at 8).

As the defendant sees it, his version of what happened must be credited as a matter of law unless the plaintiff's evidence "render[s] completely unbelievable" his testimony.  (Doc. 35 at 5).   Without belaboring the point, that is not the law.  To survive a properly supported motion for summary judgment, a plaintiff need not show that a jury could not believe the defendant's version but only that a jury could believe the plaintiff's version.  As discussed above, the plaintiff has far exceeded that threshold.

The defendant's principal brief focuses primarily on the plaintiff's expert, apparently under the misapprehension that he provides the "only testimony that could be construed as favorable to Plaintiff."  (Doc. 28 at 21).  The defendant does not challenge the expert's qualifications or methodology but instead complains that his testimony "is inconsistent and directly contradicted by the overwhelming eyewitness testimony and other evidence" and is indeed "contradicted by irrefutable physical and testimonial evidence," such that his conclusion as to the defendant's location when he shot Garrett cannot create a fact issue sufficient to

defeat summary judgment. (*Id*. at 2, 21-22). The defendant does not identify the "overwhelming" evidence that places him west of Garrett's gun when he fired, other than his own testimony to that effect.[8] But even if the defendant had more evidence than he does, it would not be enough to render the testimony of the plaintiff's expert, a state investigator, the medical examiner and an eyewitness – all of whom place the defendant east of Garrett's gun[9] – incredible as a matter of law.[10]

---

[8] In his reply brief, the defendant says that Evans and the homeowner eyewitness agree with him that Garrett "continued running for some distance" after he was shot. (Doc. 35 at 9). In fact, the homeowner testified that Garrett twisted and fell when he was shot, with his only eastward movement being that "[h]is momentum carried him forward." (Doc. 28-2 at 13). Evans testified that Garrett "went forward quite a bit a ways" before falling but corrected himself after first describing this movement as running. (Doc. 28-4 at 23). Neither witness appears to support the defendant's story that Garrett ran over twenty feet, and jumped up onto a driveway, after being shot.

[9] The defendant agrees that the eyewitness places him in the same location at the moment of shooting as does the plaintiff's expert. (Doc. 35 at 8).

[10] The defendant's cases, (Doc. 28 at 18-21), are not remotely similar to this one. In *Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004), an eyewitness's testimony did not create an issue of fact because it was "contradicted by the undisputed, clearly demonstrated, photographed physical evidence." *Id*. at 1249. Here, the expert's opinion is essentially consistent with the physical evidence and his testing; it is the defendant's version of the facts that appears to be most in tension with them. In *Harrell v. Decatur County*, 22 F.3d 1570 (11th Cir. 1994), the eyewitness's affidavit created no fact issue because it did not address the issue whether the decedent was reaching for a gun; even if it had, the affiant was so distant from the scene that her (non-existent) testimony that the victim was not going for a gun would not create a fact issue as to whether the officer reasonably *believed* he was going for a gun. *Id*. at 1580 (Dubina, J., dissenting); *Harrell v. Decatur County*, 41 F.3d 1494 (11th Cir. 1995) (on rehearing, vacating its previous opinion and affirming "for the reasons set forth in Judge Dubina's dissenting opinion"). Here, the expert was not offered to address the reasonableness of the defendant's beliefs or conduct, only to place the defendant in space at the moment he shot Garrett, and his testimony does so. Similarly, in *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), the eyewitness's statement that the decedent did not appear to be a threat to the officers could not create a fact issue because the witness knew nothing about the fifteen-minute "high-speed, reckless flight" that immediately preceded its denouement. *Id*. at 1277, 1280. Here, the expert offers no opinion as to the threat Garrett posed (about which he does not know) but only as to where the defendant was when he fired (about which he can intelligently opine based on the physical evidence of the shell casings' location and his

9

As to whether he knew when he fired that Garrett had dropped his gun, the defendant's response is more tepid, limited to the statement that "there has been no testimony to indicate that Trooper Bosarge saw or could have seen" Garrett do so. (Doc. 35 at 7). This statement is unaccompanied by any acknowledgment of the evidence identified by the plaintiff and addressed above, and the defendant's bare denial that evidence exists presents nothing for judicial consideration.

For the reasons set forth above, the Court concludes that, viewing the evidence most favorably to the plaintiff, a properly functioning jury could find that the defendant shot Garrett while knowing he was unarmed.

## II.  Qualified Immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right."  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).

### A.  Discretionary Authority.

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established

---

testing of the defendant's weapon to determine the direction and distance that ejected casings travel).

law." *Harbert*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application." *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted).  For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority.  *Id*. (internal quotes omitted).  Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof.  *Id*. (internal quotes omitted).  However, when it is "undisputed … that the [defendants] were acting within their discretionary authority," the Court can deem that element of qualified immunity established.  *E.g., Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).

The defendant asserts he was acting within his discretionary authority because he was "attempt[ing] to seize Mr. Chruma for a traffic violation."  (Doc. 28 at 13).  "Because making an arrest is within the official responsibilities of a sheriff's deputy, [the defendant] was performing a discretionary function when he

arrested [the plaintiff]," allegedly using excessive force in the process. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004); *accord Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) ("[[I]t is clear that [a sheriff's deputy] was acting within the course and scope of his discretionary authority when he arrested [the plaintiff] and transported her to jail," during which he allegedly used excessive force). Because the conduct of which the plaintiff complains occurred in the course of an attempted arrest, the defendant acted within the scope of his discretionary authority. The plaintiff offers no argument to the contrary. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (where the plaintiff did not dispute that the deputy was acting within his discretionary authority at the time of arrest, the burden shifted to the plaintiff to overcome the qualified immunity defense).

### B. Violation of a Clearly Established Constitutional Right.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2093 (2012). "The salient question … is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). To attain that level, "the right allegedly violated must be established, not as a broad general proposition, … but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 132 S. Ct. at 2094. The law is clearly established if any of three situations exists.

"First, the words of the pertinent federal statute or constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the

total absence of case law." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (emphasis omitted). The requisite fair and clear notice can be given without case law only "[i]n some rare cases." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003).

"Second, ... some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351. "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation." *Id*. "[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a government official, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id*. (internal quotes omitted). "[S]uch decisions are rare," and "broad principles of law are generally insufficient to clearly establish constitutional rights." *Corey Airport Services, Inc. v. Decosta*, 587 F.3d 1280, 1287 (11th Cir. 2009).

"Third, [when] the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances,'" then if "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar [to those involved in the opinion], the precedent can clearly establish the applicable law." *Vinyard*, 311 F.3d at 1351-52.

When case law is utilized to show that the law was clearly established, the plaintiff must "point to law as interpreted by the Supreme Court [or] the Eleventh Circuit," and such case law must pre-date the challenged conduct. *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Moreover, "[t]he law cannot be established by dicta[, which] is particularly unhelpful in qualified

immunity cases where we seek to identify clearly established law." *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) (internal quotes omitted).

   In a Fourth Amendment excessive force case, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them …." *Graham v. Connor*, 490 U.S. 386, 398 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "A court must make this determination [of objective reasonableness] from the perspective of a reasonable officer on the scene, including what the officer knew at the time …." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[11] Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

   The plaintiff relies on *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015). "Using deadly force, without warning, on an unarmed, retreating suspect is excessive." *Id.* at 1294. Again, "our precedents and those of the Supreme Court make clear that firing without first warning on a retreating, apparently unarmed suspect is excessive …." *Id. Salvato* was decided two years after the incident made the basis of this lawsuit, but it declared that this proposition was "clearly established" for purposes of qualified immunity prior to the incident made the basis of that lawsuit. *Id.* Because the incident at issue in *Salvato* occurred in July 2012,[12] it was clearly established as of June 8, 2013 that using deadly force,

---

[11] *Accord Rodriguez v. Farrell*, 280 F.3d 1341, 1352-53 (11th Cir. 2002) ("We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act.").

[12] *Salvato v. Blair*, 2014 WL 1899011 at *1 (M.D. Fla. 2014).

14

without warning, on an unarmed, retreating suspect is excessive.  As discussed in Part I, a properly functioning jury could find that the defendant used deadly force against Garrett; that Garrett was unarmed and retreating; that the defendant knew he was unarmed and retreating; and that the defendant gave no prior warning. Under the plaintiff's version of the facts, therefore, the defendant is not entitled to qualified immunity.

The defendant asserts that, even if a jury were to find he knew Garrett was unarmed, he is still entitled to qualified immunity because the situation was rapidly unfolding.  (Doc. 28 at 25-27).  The cases on which the defendant relies, however, do not suggest that a law enforcement officer has leave to kill without warning a retreating misdemeanant whom the officer knows is unarmed just because the suspect only recently abandoned his weapon.  In the three Eleventh Circuit cases he cites, the suspect was still in possession of a deadly weapon (a vehicle) when he was shot; in two of them, the suspect was actively employing the vehicle as a weapon, and in the third he had (or had not) just ended a long, high-speed chase in which he had so employed the vehicle.[13]

The defendant's only other appellate authority is *Mullins v. Cyanek*, 805 F.3d 760 (6th Cir. 2015).  In *Mullins*, the defendant wrestled for over a minute with a suspect believed to be armed until, in a five-second span, the suspect produced a gun with his finger on the trigger, the defendant ordered the suspect to drop the gun, the suspect threw the gun ten or more feet behind the defendant, and the defendant, still at close quarters, shot the suspect twice.  *Id*. at 763-64, 766, 767. The defendant did not receive qualified immunity simply because he fired shortly after the suspect abandoned his weapon but because he had not visually confirmed that the gun was gone, "he did not have a chance to realize that a potentially dangerous situation had evolved into a safe one," and he shot "within the time

---

[13] *Troupe v. Sarasota County*, 419 F.3d 1160, 1164, 1168 (11th Cir. 2005); *Robinson v. Arrugueta*, 415 F.3d 1252, 1254, 1255-56 (11th Cir. 2005); *Pace*, 283 F.3d at 1277-78, 1282.

frame in which a reasonable officer could have acted under the perception that [the suspect] was still armed." *Id*. at 766, 768.  In contrast, under the plaintiff's evidence the defendant watched Garrett drop his gun and keep running and therefore knew absolutely and immediately that Garrett was unarmed.  Cases in which the suspect's continued armed status was ambiguous are inapposite here.

### III.  State-Agent Immunity.

> Every peace officer … who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, … and whose duties include the enforcement of … the criminal laws of this state, and who is empowered by the laws of this state … to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).  "[W]hether a qualified police officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)." *Blackwood v. City of Hanceville*, 936 So. 2d 495, 504 (Ala. 2006) (internal quotes omitted).

"A State agent asserting State-agent immunity bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity." *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (internal quotes omitted).  "Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in *Cranman* is applicable." *Id*. The two *Cranman* exceptions are as follows:

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the

> activities of a governmental agency require otherwise; or
>     (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

792 So. 2d at 405.

The plaintiff in her complaint admits that the defendant has carried his initial burden.  (Doc. 1 at 3).  The plaintiff does not rely on the first *Cranman* exception, but she does invoke malice, willfulness and perhaps bad faith.  (Doc. 30 at 33-34).

"As this Court has previously noted, for purposes of the immunity issue, 'willful,' 'malicious' and 'bad faith' all require evidence that the defendant acted with the intent to injure or with ill will towards the plaintiff."  *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1296 (S.D. Ala. 2015) (internal quotes omitted).  "Force applied intentionally, gratuitously, and in violation of a plaintiff's clearly established constitutional rights … supports an inference that the defendant acted willfully and in bad faith."  *Id*. (internal quotes omitted).

The defendant asserts that he shot Garrett in an effort to protect himself and Evans from Garrett's threatened use of a gun.  (Doc. 28 at 2).  Under the plaintiff's version of the facts, however, the defendant knew when he fired that Garrett was unarmed and no threat.  Moreover, the defendant affirmatively denies shooting Garrett in order to prevent his escape.  (Doc. 35 at 4).  A properly functioning jury thus could find that the defendant shot Garrett intentionally and gratuitously, with the intent to injure him, and Part II establishes that, under the plaintiff's version, the defendant violated Garrett's clearly established constitutional rights in shooting him.  Accordingly, a properly functioning jury could find on the evidence presented that the defendant shot and killed Garrett willfully, maliciously, and/or in bad faith so as to strip him of state-agent immunity.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **denied**.

DONE and ORDERED this 8th day of June, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE